## Commonwealth *ex rel.* Hamilton *versus* The Select and Common Councils of the City of Pittsburgh.

If there be a clear legal right in the relator, a corresponding duty in the defendant, and a want of any other adequate and specific remedy, a writ of *mandamus* will lie.

It is the proper and appropriate writ, to compel a municipal corporation to make provision for the payment of interest, due upon bonds issued by it in payment of a subscription to the stock of a railroad company, by the assessment and collection of the necessary taxes.

A power to borrow money by a municipal corporation, includes that of giving its bonds, or other usual securities, to the lender.

A *mandamus* requiring a municipal corporation to provide for the payment of the interest on its bonds, need not set forth when the principal will become due, nor when nor where the interest is to be paid.

Nor is it necessary that the relator's title to the bonds should be set forth ; the averment of his ownership is sufficient, to show his right to ask the interference of the court by *mandamus*.

The ownership of the bonds necessarily includes the ownership of the right to the interest secured by them, and of the coupons attached, which are part of the securities.

An averment that the defendants have refused to make any provision for the payment of the interest, is sufficient; without showing that a demand was made upon them to do so.

The grant of the power to assess and collect taxes for the payment of the interest on the bonds, imposes upon the defendants the duty of exercising such power.

If an Act of Assembly direct that provision be made for the payment of the principal and interest of the debt thus incurred, by the assessment and collection of a tax, the defendants may be compelled by *mandamus* to assess and collect a tax for the payment of interest.

It is a sufficient averment of the want of other legal remedy, that the relator distinctly assert that he cannot have adequate relief without the aid of a writ of *mandamus*.

The Supreme Court, whilst in session in either of its districts, may issue writs of *mandamus* to any part of the state. Its jurisdiction is co-extensive with the state.

A *mandamus* to compel the assessment and collection of a tax for the payment of the interest on bonds issued by the City of Pittsburgh, is properly directed to the individuals composing the Select and Common Councils of the city.

An authority given to the City of Pittsburgh to subscribe for the stock of a railroad company, is properly exercised by The Mayor, Aldermen, and Citizens of Pittsburgh ; which is the corporate title of the city.

The holder of bonds made payable to bearer, has a right to presume that they were issued and transferred in the mode agreed upon between the original parties.

He is not affected by an agreement between the obligor and obligee, that the latter should provide for the payment of the interest thereon.

That the remedy sought by the writ of *mandamus* will benefit the holders of other bonds, as well as the relator, is no objection to the writ.

It is not sufficient, in the return, to aver that the bonds were not transferred

[Com'th *ex rel.* Hamilton *v.* Select and Common Councils of Pittsburgh.]

in accordance with the Acts of Assembly; the defendants must show wherein the supposed illegality of the transfer consists.

The grant of power to assess and collect a tax for a particular purpose, is a repeal, *pro tanto,* of all prior statutory restrictions upon the exercise of the power of taxation.

An averment, in the return, that the liability of the city, upon the bonds, is disputed, is not sufficient to prevent the issuing of a peremptory *mandamus;* the defendants must obey the writ, or show facts from which the court may determine that the debt is not due; or, at least, that it is doubtful whether it be due.

The pendency of a suit upon other bonds than those of the relator, is not material, in the absence of any averment of facts which, if true, would amount to a defence.

MANDAMUS. This was an alternative *mandamus* issued, at the relation of R. G. Hamilton, against The Select and Common Councils of the City of Pittsburgh, composed of D. Fitzsimmons, and others, commanding them to assess and levy a tax, to provide for the payment of interest upon bonds issued by the said city, in payment of its subscription to the capital stock of the Chartiers Valley Railroad Company.

The writ of mandamus was as follows:—

"*Eastern District of Pennsylvania:* ss.

"The Commonwealth of Pennsylvania,

"To the Select and Common Councils of the City of [SEAL] Pittsburgh, composed of D. Fitzsimmons, J. T. Kincaid, Wm. Phillips, James I. Bennett, Jackson Duncan, James Herdman, James McAuley, W. B. Brown, Thomas S. Blair, David Kammerer, Wm. Ward, A. B. Berger, Thomas Barbin, Jacob Tomer, Joseph Nixon, Lewis Kim, Joseph Read, John McCargo, select councilmen; and James Rees, Joseph Ross, S. R. Burkheimer, Aaron Floyd, J. R. Reed, Andrew Fulton, James P. Barr, Edward Campbell, Jr., James Gildea, Thomas Barns, J. H. Bailey, H. Demmler, E. P. Darlington, James Robb, B. Thompson, William Seibert, George Hill, S. S. Davis, I. Ward, Theodore Robbins, Henry McGeary, Russell Errett, Wm. Barnhill, Sr., Robert Coward, Christopher Magee, Joseph C. Dixon, and James Donnell, common councilmen, greeting:—

"Whereas, by an Act of Assembly of said Commonwealth, approved the 7th day of February 1853, certain persons therein named were authorized to organize a company, by the style and title of the 'Chartiers Valley Railroad Company.'

"And section 6th of said act authorized the City of Pittsburgh to subscribe to the capital stock of the said company, not exceeding the number of 5000 shares; to borrow money to pay for such subscription, and to make provision for the payment of the principal and interest of the money so borrowed, by the assessment and collection of such tax as may be necessary for that purpose, as in other cases of loans to corporations.

VOL. X.—32

[Com'th *ex rel.* Hamilton *v.* Select and Common Councils of Pittsburgh.]

" And section 7th of said act provided, that the subscription of stock aforesaid should be directed by resolution, passed by the corporate constituted authorities of the said city.

" And an ordinance of councils of said city, passed the 27th day of June 1853, authorized and directed the mayor to subscribe, in behalf of said city, for 3000 shares of the capital stock of said company, and to make and execute bonds for the payment of such subscription.

" And on the 6th day of May 1854, the mayor of said city subscribed in behalf of said city, 3000 shares, or $150,000, to the capital stock of said company; and that the bonds of said city, having coupons attached, in the gross amount aforesaid, and in amounts respectively of $1000, dated the 1st day of July 1854, duly signed by the mayor, countersigned by the treasurer, and sealed with the corporate seal of said city, were issued in payment of such subscription.

" And whereas, R. G. Hamilton purchased and is possessed in his own right of two of said certificates of loan, or bonds, representing $2000, numbered respectively 30 and 31. That said certificates of loan or bonds, on the face thereof, do set forth and declare that the faith, credit, and property of the said city of Pittsburgh were pledged for the payment of the principal and interest thereof, and that said certificates of loan or bonds were issued in pursuance of the above-mentioned Act of Assembly and ordinance of the said city.

" And said certificates of loan or bonds were duly transferred in accordance with the aforesaid Act of Assembly.

" And a large amount of interest on said certificates of loan or bonds is now, and has been for some time past, due and payable thereon to your petitioner and other holders thereof, but that the said city of Pittsburgh has wholly neglected and refused to pay said interest so due, or to make any provision whatever for the payment of said interest.

" And by virtue of the said Act of Assembly, and also of the Act of Assembly of said Commonwealth conferring upon the Select and Common Councils of the City of Pittsburgh power to assess and collect tax for the use of said city, it became the duty of the Select and Common Councils of said city in each and every year to provide for the payment of the said interest on said certificates of loan or bonds, by the assessment and collection of such taxes as might be necessary for the purpose.

" And the said Select and Common Councils of said city have wholly and wrongfully neglected to make any provisions whatever for the payment of the said interest, so accruing on the said certificates of loan or bonds, although, as aforesaid, authorized and required so to do, as in other cases of loans to said city.

" By reason whereof the said R. G. Hamilton has been unable

[Com'th *ex rel.* Hamilton *v.* Select and Common Councils of Pittsburgh.]

to recover the amount of interest now, and for a long time past, due and unpaid. And whereas the holders of said certificates of loan or bonds have demanded and endeavoured to procure the payment of said interest so due and unpaid; and whereas said councils, in violation of their duty, have wholly neglected to make provision for said payment, and in consequence thereof said interest has not been paid; and whereas the holders of said certificates of loan or bonds, and the said R. G. Hamilton, one of said holders, cannot have adequate relief in the premises, without the aid of a writ of *mandamus.*

"We, therefore, being willing that due and speedy justice should be done in this behalf, do command you, firmly enjoining that forthwith you make full and ample provision for the payment of all the interest now due on said certificates of loan or bonds, and that which shall become due thereon in the year 1859, by the assessment and collection of such taxes as may be necessary for the purpose, as in the aforesaid Act of Assembly you are authorized and required to do. And that all and singular the matters for the speedy performance of the foregoing, according to the exigency of the law, you shall do and execute immediately; or the cause wherefore you cannot do the same, to us you shall signify on or before the 19th day of March, next, at Philadelphia, lest for your default further complaint shall come to us.

"Witness, the Honourable WALTER H. LOWRIE, Esq., Doctor of Laws, Chief Justice of our said Supreme Court, at Philadelphia, the fourth day of February, in the year of our Lord one thousand eight hundred and fifty-nine, and of the Commonwealth the eighty-third.

　　　　　　　　　　　　　　"ROBERT TYLER,
　　　　　　　"*Prothonotary Sup. Court, E. D. Pa.*"

To this writ, the defendants made the following return:—

"The several plea and return of the said Council of The Mayor, Aldermen, and Citizens of Pittsburgh. The said defendants come into court and say:—

"That for the purpose of holding the said Supreme Court, and for the rightful convenience and protection of the citizens of this state, as suitors therein, it was provided by law, that the Commonwealth of Pennsylvania should be divided into four judicial districts, in each of which the judges of the Supreme Court should annually hold one term thereof, to be continued from time to time, as long as the business depending before them; at any of the said districts, should render it necessary, and should have and maintain a separate seal, together with a prothonotary or clerk of the said court, with return days for writs and process issuing from the said court in the respective districts. That one of the said districts is entitled the Western District, and the

[Com'th *ex rel.* Hamilton *v.* Select and Common Councils of Pittsburgh.]

terms for the said district are required to be holden at the city of Pittsburgh, at which place there is had and kept a regular seal, together with a prothonotary or clerk of the said court. That the defendants are citizens and inhabitants of the city of Pittsburgh, and officers of a local public corporation within the said Western District, known by the name and style of The Mayor, Aldermen, and Citizens of Pittsburgh, having no existence or power of removal elsewhere, and by law suable only in the local courts; and that they have been personally served with the said writ, in the said city, and within the boundaries of the said Western District.

" And the said defendants further say, that they ought according to the laws and customs of this Commonwealth, and their liberties and privileges as citizens thereof, to be free and exempt from being compelled against their will, and have not at any time or times, whatsoever, hitherto been used or accustomed to be compelled to answer any plea or plaint before any of the judges of the said court, except before the said judges at Pittsburgh, in the Western District aforesaid, by bill or suggestion filed in the said Western District, and particularly for or about any matter or thing connected with their alleged office, as members of a public and local corporation within the said district: And this they are ready to verify: wherefore they pray judgment, if the said court, now sitting at Philadelphia, for the Eastern District thereof, will or ought to take cognisance of the said plea.

" And the said defendants, by protestation, not confessing the jurisdiction of this court, or waiving any objection to the regularity of the proceeding in this case, or admitting any of the matters in the said writ of *mandamus* contained to be true as is therein alleged, for further return to the said writ, come into court and say:

" That there is no such corporation or body politic known to the law as the City of Pittsburgh, of whose councils, Select or Common, the persons named in the said writ are supposed to be members, and that the body of which the said individuals are in point of fact councilmen, consisting of the inhabitants of the said city only, was constituted and established by law, and still continues to exist by the name and style of 'The Mayor, Aldermen, and Citizens of Pittsburgh,' with perpetual succession and capacity in law to take and hold its franchises, liberties, jurisdiction, and property, and to sue and be sued in all courts of record, as a body corporate and politic, in law and in fact, by that name only.

" And the said defendants further say, that in none of the said several Acts of Assembly, in the said writ mentioned, is the said corporation known by the name and style of The Mayor, Aldermen, and Citizens of Pittsburgh, and of which they are one of

the council, as aforesaid, named, or any powers conferred upon the councils thereof, to subscribe for stock in the said recited railroad company, or to issue bonds therefor, or to make provision for the payment of the principal or interest thereof: and that they are advised and believe, that in a case where it is proposed to enlarge the powers of the councils to an extent so enormous and unprecedented as that of authorizing a subscription to a railroad outside of the corporate limits of the said city, by the mere authority of the legislature, and without the consent or knowledge of the corporators, or of the non-resident freeholders and tax-payers owning property therein, nothing is to be taken by intendment to bind those who are not, expressly named.

"That the Select and Common Councils of the corporation called and known by the name and style of The Mayor, Aldermen, and Citizens of Pittsburgh, of which said bodies the said individuals are members, as aforesaid, are by law deliberative and legislative bodies only, with power to make, ordain, constitute, and establish such and so many ordinances, regulations, and constitutions as may be necessary or convenient for the government and welfare of the said city, and the same to enforce and, put in execution and at their pleasure to revoke, alter, and make anew as occasion may require; and as they are advised and believe, possessed, as such, of an entire discretion in the exercise of all the power committed to their hands, subject to no control whatever beyond their own sense and convictions of duty in the premises, so long as they are acting within the legitimate sphere of the powers so conferred.

"And the defendants further say, that the said Select and Common Councils are not integral members of the corporation aforesaid, but only several and co-ordinate branches of the legislature thereof, acting separately and independently of each other; that the concurrence of both of said bodies is essential to the validity of all legislative acts affecting the said corporation; and that the said defendants are without power of themselves, under the charter of said city, to assess or impose taxes, or to compel the concurrence of the other branch of said councils in any act whatever relating to their proper functions as a council.

"And the said defendants further say, that although it is true, that by an Act of Assembly passed on the 7th day of February, A. D. 1853, certain persons therein named were authorized to organize a company by the name and style of 'The Chartiers Valley Railroad Company;' and that by the same act the City of Pittsburgh was authorized to subscribe to the capital stock of said company, not exceeding 3000 shares, to borrow money to pay for such subscription, and to make provision for the payment of the principal and interest of the moneys so borrowed, by the

[Com'th *ex rel.* Hamilton *v.* Select and Common Councils of Pittsburgh.]

assessment of such tax as might be necessary for that purpose, as in other cases of loans to *corporations:* and although by an ordinance of The Mayor, Aldermen, and Citizens of Pittsburgh, passed on the 27th day of June, A. D. 1853, the mayor of said city was authorized to subscribe in behalf of said city, for 3000 shares of the capital stock of said company, and to make and execute bonds for the payment of such subscription : and although the mayor of the said last-named city did subscribe on behalf of said city, the said recited number of shares, amounting in all to the sum of $150,000, and did afterward make and execute sundry certificates of loan, or bonds to the said company for the said amount: the said defendants say, that by the said recited Act of Assembly it was further provided, that the certificates of loan, or bonds to be issued therefor, should be transferable in such manner as should be directed by the said city, and that the same might be received by the said company in such manner as might be agreed upon between the parties.

" And the said defendants in fact say, that no money whatever was borrowed to pay for the said stock, and no provision made in the said ordinance for the payment of the principal or interest of moneys borrowed, or intended to be borrowed for such purpose, in conformity with the true intent and meaning of the said recited act; but that the said bonds were made payable, and actually delivered to the said company itself; and that no direction was made or given by the said corporation, as was required by the said act, as to the manner in which the said bonds should be transferable.

" And the said defendants further say, that by the terms of the said recited ordinance, it was provided, among other things, that the directors of the said company should agree with the said city in writing, with the mayor, to pay the current interest accruing on the said bonds; that the sum of $350,000 of subscriptions to the said road should be first made and secured from other responsible sources than contractors; that the moneys realized from the sale of the said bonds should be expended in the construction of said road nearest to Pittsburgh; that no bond or bonds should be issued or signed by the mayor, until the survey and location of said road should first be made and agreed on by the board of directors; and also that the councils of the said city should appoint three of their number as a committee, under whose control the bonds should be sold : of all which the relator and all other pretended holders of the said bonds had legal notice, as they are advised and verily believe.

" And the said defendants aver and charge it to be true, that the directors of the said company did not enter into any agreement with the said city, in writing with the mayor, to pay the

current interest on the said bonds, and did not pay the same, but have on the contrary altogether neglected and refused in consequence of their admitted inability so to do; that the sum of $350,000 of subscriptions to the said road was not first made, or at any time made or secured from other responsible sources than contractors; that the money realized from the sale of the said bonds, if any of them were in point of fact sold, was not expended in the construction of said road nearest to Pittsburgh, but that on the contrary, although it was the declared object of the said recited Act of Assembly, and of the charter of the said company, to construct a railroad from the city of Pittsburgh to the borough of Washington, the project of constructing their road to or from the said city of Pittsburgh has been altogether abandoned; that the said bonds were signed and issued by the mayor without any survey or location of that part of the contemplated railroad next adjacent to and within six or seven miles of the city of Pittsburgh, which, so far as the said defendants are advised, has never yet been surveyed or located; and that the councils of the said city did not, so far as their records show, at any time appoint three of their number as a committee, under whose control the said bonds should be sold, nor were any of the said bonds sold under the control or direction of any such committee. And that the said subscription was therefore made, and the said bonds issued and transferred without authority of law, and in fraud of the rights and interests of the inhabitants and freeholders of the said city.

"And the said defendants further say, that although the said bonds were made payable, and actually delivered to the said company upon the above-recited conditions only, the directors of the said company have altogether neglected and refused to pay the current interest accruing upon the said bonds; that the road of the said company is still unfinished, and all operations indefinitely suspended thereon, in consequence of the admitted inability of the said company to prosecute the same to completion; that the said company is now and has been for a long time past notoriously and helplessly insolvent, and unable to perform the conditions upon which the said bonds were issued as aforesaid, and of which the relator and all other holders of the said bonds had notice, as the defendants are advised and verily believe; and that the stock of said company is entirely worthless.

"And the said defendants further say, that they are advised and believe, that by the laws and customs of this Commonwealth of old time used and approved, the said certificates of loan or bonds being made and executed under the seal of the said corporation, are open to every legal defence appearing on the face thereof, and subject to every equity to which the same were liable in the hands of the original holders; that all purchasers thereof are affected with notice of the said defences, and that by the same

[Com'th *ex rel.* Hamilton *v.* Select and Common Councils of Pittsburgh.]

laws and customs it is the right of the said corporation, when sued in a court of law, to avail themselves of all such defences, whether legal or equitable.

" But whether the relator is in the actual possession of any of the said bonds, or whether the said bonds, or any of them, have been passed away by the said company for a valuable consideration, the defendants being but temporary officers of said corporation, and not the parties properly suable on any contract thereof, do not know, and are not otherwise advised than by the unsupported declaration of the relator himself; and do, therefore, as they are in conscience and duty bound, altogether deny, and insist that he may be held to the proof thereof, by such evidence as is usual in courts of law.

" And the said defendants submit, that as to any of the said bonds other than the one claimed to be holden by the relator, they are not required by law to answer in the present suit; and insist that, if separate claimants can be properly joined in an action at law, upon distinct and independent contracts, they shall be made parties to the record, and their claims respectively set forth, so that the said defendants may have an opportunity to answer and defend against them.

" And the said defendants altogether deny that the said certificates of loan or bonds so issued as aforesaid, or any of them, were transferred in accordance with the said recited Acts of Assembly, or any of them; or that by the said Acts of Assembly, or either of them, or the act conferring upon the Select and Common Councils of the City of Pittsburgh the power to assess taxes for the use of the said city, it became the duty of the said councils to provide for the payment of the interest on said certificates or bonds, by the assessment of such taxes as might be necessary for that purpose; but, on the contrary, aver, that by the laws governing the said corporation, they have no power, and are expressly prohibited from laying on any more tax in any one year, on the valuation of taxable property, than is already assessed and required for the ordinary uses of the said city.

" And the said defendants further say, that the debt supposed in the said writ of *mandamus* to be due and owing to the relator by the said City of Pittsburgh, is altogether disputed and denied by the body corporate and politic of which they are one of the council as aforesaid; and that although the courts of the county of Allegheny, within which the said corporation is located, are open to the said relator, and a specific remedy is provided by law, as in other cases, which is entirely adequate and sufficient, no suit has been instituted by the relator against the said corporation, for the purpose of establishing his said claim, or liquidating and ascertaining the amount thereof, and no judgment has been recovered thereon to entitle him to the award of a *mandamus* in

[Com'th *ex rel.* Hamilton *v.* Select and Common Councils of Pittsburgh.]

the nature of an execution, or otherwise, for the collection thereof, even if the remedies provided by law for such collection were not entirely adequate.

" And the said defendants further say, that an action at law has been already instituted against the said city, in the District Court of Allegheny county, at the instance of another party claiming to be the holder of others of the bonds recited in the said writ, wherein the said corporation has taken full defence against the payment of the same, and that the said action is still pending and undetermined.

" And the said defendants further say, that the corporation known by the name and style of The Mayor, Aldermen, and Citizens of Pittsburgh, of which only they are one of the council, or members, is a public corporation composed of the inhabitants or freemen of the said town only, and organized for purposes of local government only, and for the protection of the lives, liberty, and property of its citizens; that the said Chartiers Valley Railroad Company is a private corporation, erected for the purpose of constructing a railroad in the counties of Allegheny and Washington, and not in the city of Pittsburgh, as an instrument of trade and profit in the transportation of. goods, wares, and merchandise, produce and passengers, as common carriers thereupon; that the owners of a large portion of the freehold of the said city are not inhabitants thereof or members of the said corporation; and that no authority was at any time conferred by the inhabitants or freemen of the said city, or any of the non-resident freeholders and proprietors of lands situated therein, upon either the mayor or councils of the said city, to subscribe to the capital stock of the said company, or to embark their labour or property in the hazards of trade and business, and for objects entirely incongruous with the purposes of such corporations, whether as common carriers or otherwise.

" And the said defendants further say, that by the sixth section of the Act of the 5th of March 1804, entitled 'An Act to alter an Act, entitled "An Act to erect the town of Pittsburgh, in the county of Allegheny, into a borough, and for other purposes,"' which said act is recognised and adopted in the act defining the powers of the councils of said city, it is provided, that no tax shall be laid in any one year on the valuation of taxable property, exceeding half a cent on the dollar, unless some object of general utility shall be thought necessary, in which case a majority of the taxable inhabitants of said borough, by writing under their hands, shall approve of and certify the same to the town council, who shall proceed to assess the same accordingly. That the tax required and assessed at present, and for a long time past, for the ordinary uses of the said city, is at the rate of half a cent on the dollar in every year on the valuation of taxable

[Com'th *ex rel.* Hamilton *v.* Select and Common Councils of Pittsburgh.]

property, being the maximum allowed by the said act. That according to the true intent and meaning of the said act, as they are advised and believe, a majority of the taxable inhabitants so declaring and certifying, are the only 'proper authorities' of the said city in reference to all objects of general utility involving the exercise of this extraordinary power; and that a majority of the said taxable inhabitants have not at any time, by writing under their hands, approved of either the said subscription as an object of general utility or of the assessment or imposition of any additional tax therefor, or certified the same to the said councils.

"And the said defendants further say, that inasmuch as they are advised, and verily believe, that the relator and all other unknown persons whom he pretends, without authority, so far as they are advised, to represent, have no legal claim against the said city; and that the said city has a just and full defence against the payment of the interest on the said recited bonds so issued as aforesaid, upon which they are entitled to be heard in the usual course of law, and before a jury of the country and of the vicinage; they cannot, without a violation of conscience and duty, as sworn officers of the said city, consent to levy a tax therefor, even though their mere powers were undisputed in the premises.

"And the said defendants altogether deny that the said relator has at any time, so far as they are advised, demanded payment of his pretended claim for interest from the said city or the proper officers thereof; but on the contrary aver and charge it to be true, that the said relator, and all other persons claiming and pretending to hold said bonds, well knowing the terms and conditions upon which the same were issued, have always heretofore, and until the insolvency of the said company, had recourse to the said railroad company only as the payers thereof, and received from it, and not from the said city, the accruing interest upon the said bonds; that it was not until such insolvency, that any claim whatever was set up against the said city; and that moreover the coupons, or interest certificates annexed thereto, are not in the name and do not, as they are advised, import any agreement on the part of the Mayor, Aldermen, and Citizens of Pittsburgh.

"And the said defendants further say, that the bonds so issued as aforesaid, if authorized by law (which they altogether deny) were issued exclusively under the authority of the legislature of this state, through the said councils as the appointees and agents of the said legislature for that purpose, and the seal of the said corporation thereto affixed by the procurement of the officers of the said company, and without the authority of the inhabitants and tax-payers thereof, and without any reference whatever to their opinions thereon; and that inasmuch as the validity thereof

[Com'th *ex rel.* Hamilton *v.* Select and Common Councils of Pittsburgh.]

under the decisions of this court in nowise depends upon the acts or concurrence of the said inhabitants or tax-payers, or even of a majority of them, but solely on the supposed power of the legislature to impose the said subscriptions at their own will and pleasure, and that of the said councils only, the same are not in the nature of a contract to be enforced by the extraordinary writ of *mandamus;* and that the exercise of the taxing power which is thus invoked for that purpose by the relator, is not a *judicial* function, but an act of sovereignty, for which this court has no jurisdiction whatever.

"For which said several reasons, all of which these defendants are ready and willing to aver, maintain, and prove, as this honourable court shall direct, the said defendants respectfully submit whether they can be called upon to answer further to the said writ of *mandamus;* and humbly pray to be hence discharged, with their reasonable costs and charges, in this behalf most wrongfully sustained."

To this return the relator filed a general demurrer.

*Harding, Price,* and *Meredith,* for the relator.—The Supreme Court has power to issue a *mandamus* to any part of the state, whilst sitting in either of its districts: *Const. art.* V. *sect.* 4, 6; 5 *Binn.* 102; *Purd. Dig.* 560; Pennsylvania Railroad Co. *v.* Canal Commissioners, 9 *Harris* 9. And it is the appropriate remedy in this case: *Brown's Com. Law* 254; Thomas *v.* Allegheny County, 8 *Casey* 222; *Tapping on Mandamus* 12, 14, 19; Richards *v.* Dyke, 3 *Q. B.* 267; Graham *v.* City of Maysville, 6 *Am. L. R.* 620; *Tapping* 67, 85, 93, 134, 210.

The Act of 7th February 1853 authorized a subscription to the capital stock of the Chartiers Valley Railroad Company by "The City of Pittsburgh," and this is a sufficient designation of the municipal body, represented by the defendants. And although the councils may be deliberative bodies, they are not beyond the control of this court, which may require the performance of the duties enjoined on them by law.

The bonds are under the seal of the corporation, and it will be presumed that they were in the form required by law: St. John's Church *v.* Steinmetz, 6 *Harris* 273; Turnpike *v.* Myers, 6 *S. & R.* 12. The direction as to the manner in which they should be transferable, is evidenced by the bonds themselves, which are made payable to bearer; and this is sufficient as respects a purchaser: Graham *v.* City of Maysville, 6 *Am. L. R.* 597; 1 *Watts* 385.

A purchaser has nothing to do with any agreement between the city and the railroad company, in respect to the payment of the accruing interest. He was only bound to take notice of what

[Com'th *ex rel.* Hamilton *v.* Select and Common Councils of Pittsburgh.]

was contained in the Act of Assembly under which they were issued, and of what appeared on the face of the bonds.

It is true, the bonds, in the hands of an assignee, are open to every legal defence appearing on their face; but we deny that he took them subject to any equities to which they were liable in the hands of the railroad company: 3 *Casey* 413; United States *v.* Kennan, 1 *Pet. C. C.* 168; Blymire *v.* Boistle, 6 *Watts* 183; Heilner *v.* Imbrie, 6 *S. & R.* 401, 408, 410. The bonds being payable to bearer, possession was sufficient evidence of title: Shaw *v.* Levy, 17 *S. & R.* 99; Hazard *v.* Hamlin, 5 *Watts* 201; Thompson *v.* Lee, 3 *W. & S.* 479; Fletcher *v.* Peck, 6 *Cranch* 87, 132–4; Price *v.* Junkin, 4 *Watts* 85; Fetterman *v.* Murphy, *Id.* 424; Hoffman *v.* Strohecker, 7 *Id.* 90; Cadbury *v.* Duval, 10 *Barr* 272; Mott *v.* Clark, 9 *Id.* 399; Davis *v.* Barr, 9 *S. & R.* 137, 141; Taylor *v.* Gitt, 10 *Barr* 428; McConnell *v.* Wenrich, 4 *Harris* 365; *Brightly* 324; Pryor *v.* Wood, 7 *Casey* 142.

When the legislature gave the power to assess a tax for the payment of these bonds, all prior limitations upon the taxing power were repealed *quoad hoc.*

*Williams*, for the defendants.—The relator must, by affidavit, show title to the writ: *Burr.* 2190; *Tapping* 293–4; 2 *T. R.* 180; 1 *D. & M.* 471; 8 *Ad. & E.* 413. No mere matter of form can be objected on general demurrer: *Stephen on Plead.* 141–3; 1 *Saund.* 337 b. note 3; 1 *Arch.* 318; 9 *Wend.* 429; 10 *Pick.* 59; 9 *Johns.* 314; 1 *Verm.* 44; *Ang. & Ames on Corp.* 590. It is sufficient that the return show a legal reason for not obeying the writ: 2 *T. R.* 261; 6 *Id.* 495; 1 *Show.* 288; 10 *Pick.* 59. And where a return is set down for agreement on demurrer, the defendant may take advantage of defects of substance in the writ: *Tapping* 338, 380; *Ang. & Ames on Corp.* 589; 8 *Mod.* 21.

The title of the relator must be clearly stated; 10 *Wend.* 25; which is not done in the present case. And besides, the jurisdiction is not a clear one. The writ ought not to have been issued out of the proper district: Leech *v.* Canal Commissioners, 9 *Harris.* And the court will not assume it to enforce a private right: *Tapping* 11; 1 *T. R.* 404; *Cas. Temp. Hardw.* 99; 3 *Dall.* 48; 2 *Str.* 1082; *Ang. & Ames* 579; 1 *T. R.* 399; *Cowp.* 103; 16 *S. & R.* 317; 2 *Penn. R.* 518; 6 *W. & S.* 398. The counsel for the defendants also argued at length, and in detail, the several objections to the writ set forth in the answer and return.

The opinion of the court was delivered by

Strong, J.—The alternative *mandamus* in this case, following the suggestion of the relator, avers that he is the owner of two certificates of loan or bonds of the City of Pittsburgh, each for the sum of $1000, the ownership of which he acquired by pur-

chase; that these certificates of loan or bonds, with others, amounting in all to the sum of $150,000, were issued by the said city in payment of a subscription for three thousand shares of the capital stock of the Chartiers Valley Railroad Company; that all the bonds are signed by the mayor of the city, countersigned by the treasurer, and sealed with the city's corporate seal; and that they pledge the faith, credit, and property of the said City of Pittsburgh for the payment of the principal and interest thereof. It is further averred, that by an Act of Assembly, approved February 7th 1853, the organization of the Chartiers Valley Railroad Company was authorized, and the City of Pittsburgh was empowered to subscribe to the capital stock of said company, not exceeding the number of five thousand shares, to borrow money for the payment of such subscription, and to make provision for the payment of the principal and interest of the money so borrowed by the assessment and collection of such tax as may be necessary for that purpose, as in other cases of loans to corporations. It is further averred, that the Act of Assembly provided, that the subscription to the stock should be directed by resolution passed by the corporate constituted authorities of said city, and that accordingly the councils thereof, by ordinance passed the 27th day of June 1853, authorized and directed the mayor to subscribe in behalf of the city three thousand shares of the capital stock of said company, and to make and execute bonds for the payment of such subscription. Still further, it is averred, that the bonds were duly transferred in accordance with the Act of Assembly, and that a large amount of interest is now, and has been for a long time past, due and payable upon them, but that the City of Pittsburgh has wholly neglected and refused to pay said interest so due, or to make any provision whatever for the payment thereof; and that under the Acts of Assembly it is the duty of the Select and Common Councils of the said city, in each and every year, to provide for the payment of said interest, by the assessment and collection of such taxes as may be necessary for the purpose; but that they have wholly and wrongfully neglected to make any provision whatever for the payment, notwithstanding the holders of the bonds or certificates of loan have demanded and endeavoured to procure payment.

We shall spend no time in endeavouring to prove, what is apparent upon the face of this statement of facts, that it presents a fit case for a *mandamus.* Here is a clear legal right in the relator, a corresponding duty in the defendants, and a want of any other adequate and specific remedy. No action at law would lie at the suit of the relator against the defendants, for not making provision for the payment of the interest, for not levying and collecting a tax, which is the thing sought to be accomplished by this writ. That an action might be brought against the city upon the bonds

[Com'th *ex rel.* Hamilton *v.* Select and Common Councils of Pittsburgh.]

themselves is true, but that is not the right here asserted, nor would it enforce the duty alleged.  The liability of the city to pay the bonds is one thing, the duty of the councils to make provision for their payment is quite another.  The city councils are public bodies, and the members of the council are public officers. Nothing is better settled than that *mandamus* is the appropriate writ by which the Commonwealth compels the performance of a public duty.  The propriety of this form of remedy for such a case as this relator presents, was fully vindicated in Commonwealth *ex rel.* Thomas *v.* The Commissioners of Allegheny Co., 8 *Casey* 218, and both English and American authorities were referred to in support of its use.  Cases are numerous in which the writ has been sustained to enforce the levy and collection of a tax : Queen *v.* The Wardens of the Parish of St. Saviour, 7 *Ad. & El.* 925; Queen *v.* The Select Vestrymen of St. Margaret, 8 *Ad. & El.* 889; Queen *v.* Thomas, 3 *Com. Bench* 589.  Tapping, in his Treatise on *Mandamus*, says, page 67, " The writ has often been granted to command churchwardens to make and raise one or more rates for the repayment of principal money, with interest, borrowed on the credit of the parish and church rates."  So it has been granted to command justices to tax, rate, and assess a parish for the support of the poor.  In the case of The Justices of Clark *v.* The Paris, &c. Turnpike Road Company, 11 *B. Monroe* 143, it was decided, that *mandamus* was the appropriate and only remedy for compelling compliance with a duty to levy money to pay a subscription to the stock of a turnpike road company. In Graham *v.* City of Maysville, 6 *Am. L. R.* 589, it was applied by the Court of Appeals of Kentucky to a case in all essential particulars like the present.  Many other similar decisions might be cited.  If, then, the relator is the owner of some of the bonds upon which interest is due and payable, and if it be the duty of the defendants to make provision for the payment of the interest, by levying and collecting a tax, a duty which they have neglected and refused to perform, it is no novelty that they are called upon by the writ of *mandamus* to discharge that duty.  The novelty is in the necessity for the writ, and not in the writ itself.

Before entering upon an examination of the return made by the defendants to the alternative writ, it seems proper to dispose of the objections urged against the writ itself.  They are eleven in number, and all of them are merely formal.  The first is, that it does not aver or set out any law conferring authority upon the City of Pittsburgh to make provision for the payment of bonds, or interest accruing thereon, by assessing and collecting taxes, but avers that a subscription was made, and that bonds were issued in payment of said subscription, without showing any authority of law for the issue of bonds for that purpose.  The writ does,

[Com'th *ex rel.* Hamilton *v.* Select and Common Councils of Pittsburgh.]

however, aver authority in the City of Pittsburgh, conferred by an Act of Assembly, to subscribe to the capital stock, to borrow money to pay for the subscription, and to make provision for the payment of the principal and interest of the sum so borrowed, by the assessment and collection of a tax. A power to borrow money, surely it need not be argued, includes the power to give bonds or other usual securities to the lender. We cannot be expected to decide that the bonds are illegal, because the Act of Assembly did not specify what securities might be given for the money borrowed, or that a power to borrow money to pay a debt, including as it does the power to issue bonds, is not executed by giving bonds to the creditor. In substance, the money is borrowed from the purchasers of the bonds; it is advanced on the faith of the city's obligations, for the very purpose for which the city was authorized to raise it. Apart from the fact, that the Act of Assembly referred to in the writ authorized the bonds issued for the purpose of borrowing the money, to be given and received in payment of the subscription, it is to be observed that they were, in fact, made payable to bearer, that they might readily pass from hand to hand. The Chartiers Valley Railroad Company may therefore well be considered the agent of the obligors, to raise money upon their obligations. It has never before been doubted, that he is a borrower, who executes his bonds payable to bearer, and then, by his agent, sells them in the market.

It is next objected, that the writ does not set out when the principal of the bonds is payable, what rate of interest they bear, or the time or place at which it is payable. No attempt has been made to inform us why such allegations are needful. The date of the bonds, the facts that they do bear interest (which of course is legal interest, when no other rate is mentioned), the fact that interest is in arrear, the fact that the relator is the owner of some of the bonds, and the fact that the defendants have made no provision for payment, but have wholly neglected and refused to make provision, although it is their duty by law to make it, are averred, and if these averments of fact be true, the right to a peremptory *mandamus* is complete. The respondents are not now asked to make provision for the payment of the principal, nor are they by this proceeding required to pay even the interest; the demand of the writ is only that they provide for the payment of the interest. To a compliance with this demand, it is of no consequence that the writ should state when the principal will become payable, or when or where the interest is to be paid.

The next objection is, that the writ does not set out the relator's title to the bonds, but simply avers that he became the purchaser, without stating how they were transferred, or the consideration paid by him. The averment of ownership of the bonds by the relator is only necessary to show his right to ask the interference

[Com'th *ex rel.* Hamilton *v.* Select and Common Councils of Pittsburgh.]

of the court by *mandamus.* If he has a legal right, no matter how he acquired it, it is all that the law demands. The amount of the consideration paid by him on his purchase, or the mode in which the bonds were transferred to him, are quite immaterial to the question whether he has a legal right. But the writ does aver that the bonds were purchased by the relator, and that he holds them in his own right, and it also asserts, that they were duly transferred in accordance with the Act of Assembly.

The fourth exception is, that the relator alleges that coupons for the interest were attached to the bonds, but does not aver that he is either the purchaser or holder of any of the coupons, while the copy of the bond attached to his affidavit shows that the interest is only payable on the presentation of the coupons. If the exception means anything, it is that the relator's legal right is not sufficiently averred. It is, however, set out that he is the purchaser and holder of bonds bearing interest, and that all the bonds have coupons attached. The ownership of the bonds necessarily includes the ownership of the right to the interest secured by them, and of the coupons attached, which are themselves part of the securities. The writ does therefore aver sufficiently the relator's title to the interest, which the defendants neglect and refuse to provide for.

It is next urged, that the writ is insufficient, because it contains no averment that any demand was ever made upon the councils to make provision for the payment of the interest alleged to be due, by the assessment and collection of taxes for that purpose. It is undoubtedly the general rule, that the writ should contain an averment of a demand and refusal. The reason assigned is, that it should appear that the defendants have had the option of doing or refusing to do that which is required of them, before the application be made to the court for compulsory process. This is a right of the defendants; but, like all other rights, it may be waived. The law never requires a vain thing. Thus, in cases where a tender is necessary, if the party to whom it is due declares that he will not accept it, none need be made; a readiness to make it in such a case is all that is required. Here, the writ avers, not alone that the defendants have neglected, but that they have refused to make any provision for the payment of the interest. The allegation is, that they have had their option (all which a demand is intended to give), and that they have chosen to refuse. That a precise demand is not necessary in all cases, is shown in Regina *v.* Kendall, 1 *Ad. & El.* (*N. S.*) 386; and in regard to a refusal, anything which shows that the defendant does not intend to perform the duty, is sufficient to warrant the issue of a *mandamus:* 4 *B. & Ad.* 530; 10 *A. & E.* 561; 8 *A. & E.* 889, 901; Graham *v.* City of Maysville, *supra.*

The sixth exception taken to the writ is, that it contains no

[Com'th *ex rel.* Hamilton *v.* Select and Common Councils of Pittsburgh.]

reference to any act or law which makes it the duty of the Select and Common Councils of the city of Pittsburgh, or the defendants, to assess taxes for any purpose. Even if it were necessary to refer to and recite the particular Act of Assembly which imposes upon the defendants the duty, the performance of which the writ commands, it is a sufficient answer to this exception that it is not founded in fact. The writ avers that by virtue of the Act of February 7th 1853, and also of the Act of Assembly, conferring upon the Select and Common Councils of the city of Pittsburgh power to assess and collect taxes for the use of the said city, it became their duty to provide for the payment of the interest upon the bonds, by the assessment and collection of such taxes as may be necessary for the purpose.

It is absurd to argue, that conferring such a power is imposing no duty. The Select and Common Councils are public agents, created to perform a public trust. One of the purposes of their creation is, that they may provide for the payment of the debts of the city. It is true, that the Act of February 7th 1853, only declares that the city "shall have power" to make provision for the payment of the principal and interest of the money borrowed, by the assessment and collection of a tax; but in a statute the word *may* means *must* or *shall*, in cases where the public interest and rights are concerned, and where the public or third persons have a claim *de jure* that the power should be exercised. Thus, in Rex *v.* Barlow, 2 *Salk.* 609, churchwardens were indicted for not making a rate or assessment under the statute of 14 Car. 2, for the reimbursement of some constables. The words of the statute were, they "shall have power and authority to make a rate;" but the statute was construed to be peremptory, imposing a duty, because the constables had an interest in the exercise of the power. In the King *v.* The Inhabitants of Derby, *Skin.* 370, it was said that *may*, in the case of a public officer, is tantamount to *shall*. In the Newburg Turnpike Co. *v.* Miller, 5 *Johns. Ch.* 113, it was said, that whenever an act to be done under a statute, is to be done by a public officer, and concerns the public interest, or the rights of third persons, which require the performance of the act, then it becomes the duty of the officer to do it. Malcom *v.* Rogers, 5 *Cow.* 188, is to the same effect. The duty of the city is therefore imperative, to assess and collect taxes, and the power and corresponding duty are, by one of the acts referred to, devolved upon the Select and Common Councils.

It is a sufficient answer to the seventh objection to the writ, that the Act of February 7th 1853, directs that provision be made for the payment of the principal and interest of the debt incurred by the subscription, *by the assessment and collection of a tax.* The case is very unlike the King *v.* The Margate Pier Co., 3 *B. & A.*

VOL. X.—33

220. That was a *mandamus* to a corporation, commanding them to pay a poor rate. The ordinary remedy was a distress, and the writ omitted to state that the defendants had no effects upon which a distress could be levied. But here the writ avers, that by reason of the neglect and refusal of the defendants to perform their legal duty, *i. e.*, that of making provision, the relator has been unable to recover the amount of interest now, and for a long time past due and unpaid.

The eighth exception is, that the writ does not sufficiently aver the want of other legal remedy. It does, however, distinctly assert, that the relator cannot have adequate relief without the aid of a writ of *mandamus*, and no more need be averred. It is all which was alleged in the case of Commonwealth *ex rel.* Thomas *v.* The Commissioners, and the averment was there held sufficient.

· The ninth exception is, that the mandate is to provide for interest not yet due, and which may never become due, and therefore anticipates a future violation of duty. The mandate is to make provision for the payment of all the interest due when the writ issued, and all that should become due during the year 1859. Providing for the interest due, and all that would become due while the defendants are in office, is in reality one duty, and a refusal to take the first step is a refusal to perform any part of the duty.

The tenth objection is, that several parties, claiming under different rights, are joined in the same writ. This is a mistake of the fact, and therefore needs no further notice.

· The eleventh and last exception is, that the writ does not mention the amount of interest due, or for which provision is to be made. It is, however, in this respect sufficiently certain. It describes the bonds, their date and amount. They are bonds of the City of Pittsburgh. From the necessity of the case, the amount of unpaid interest must be known to the obligors. The extent of their duty is therefore defined. In this particular the writ is like that in Thomas's case, which was ruled to be sufficient.

This is all which need be said respecting the objections urged against the writ itself. They are all thoroughly technical, and many of them have been heretofore held by this court to be unavailing : 8 *Casey* 218.

· We pass, now, to the return made to the alternative writ. Several matters are alleged as reasons why the duty which the writ seeks to enforce has not been performed, and why a peremptory *mandamus* should not issue. The first is, an objection to the jurisdiction of this court. That jurisdiction is by the Constitution declared to be co-extensive with the state. The power to issue writs of *mandamus* has always been exercised by the court, and recognised as an existing power, again and again, by the legisla-

[Com'th *ex rel.* Hamilton *v.* Select and Common Councils of Pittsburgh.]

ture. We do not understand this to be denied, but it is contended, that the court, while sitting in the Eastern District, is not authorized to send its writ to the defendants, who are resident in the Western District. The state, it is true, has been divided into four districts, but for what purpose? It was not to limit the jurisdiction of the court, or to restrict the range of its writ. The districts were created, as the Act of Assembly declares, solely for the purpose *of holding* the Supreme Court, and the judges are required to hold terms in each district. If this be the object of division into districts, it can have no effect upon the range of the court's writ. Were there no such division, it would hardly be claimed, that the writ might not go to any part of the state, from the place where the court might be in session. Accordingly, it has been ruled, that the Supreme Court, at its session in either of its districts, may issue writs of *mandamus* to any part of the state : 9 *Harris* 9. And indeed it must be so ; for if these writs, and writs of *quo warranto,* did not run beyond the limits of the district in which the court is in session, there would be in many cases a failure of justice. The ruling in 9 *Harris* 9, was followed in Thomas's case, and is no longer open to question. Nor certainly can there be any reason to complain, when the defendant is heard within the district in which he resides.

The next averment of the return is, that there is no such corporation or body politic, known to the law, as the City of Pittsburgh, of whose councils, Select or Common, the persons named in the writ are supposed to be members, but that the corporate name is " The Mayor, Aldermen, and Citizens of Pittsburgh." The writ is directed to the Select and Common Councils of the city of Pittsburgh, composed of D. Fitzsimmons and others, defendants. It is not directed to the city, but to the individuals who constitute the Select and Common Councils. The question is not, therefore, whether, if an action had been brought at law against the City of Pittsburgh, the misnomer might have been pleaded in abatement, for it is not the corporation which is sued. But even if it were, the mistake is amendable. Formerly, when the doctrine of amendments remained as at common law, the court would not allow a writ of *mandamus* to be amended after return filed ; but, as is said by *Tapping,* p. 334, the strict rule of the common law has been, of late years, altogether departed from ; the principle, as to amendment, which now obtains being, that it shall be allowed in all cases, when such a course will promote justice. Thus, in a late case, the court ordered the writ to be amended during an argument, in order that such argument might proceed independently of such objection : Rex *v.* Newbury, 1 *Q. B.* 759. It needs no argument to prove that justice would not be promoted, by turning the relator out of court because he has described the defendants as members of the Select and Common

[Com'th *ex rel.* Hamilton *v.* Select and Common Councils of Pittsburgh.]

Councils of Pittsburgh, instead of members of the Select and Common Councils of "The Mayor, Aldermen, and Citizens of Pittsburgh." Even the very act which incorporated the city, more than once denominates it the City of Pittsburgh. One of our statutes of amendments authorizes an amendment of the record of any action, in any stage of the proceedings, when it shall appear, by any sufficient evidence, that a mistake has been made in the Christian name or surname of any party, plaintiff or defendant. As statutes of jeofails are construed liberally, it would seem to be within the spirit of this act to allow an amendment of a corporate name, when a corporation is a party; but whether it would or not, need not now be decided, for the *mandamus* is not to the artificial being known either as the City of Pittsburgh, or as "The Mayor, Aldermen, and Citizens of Pittsburgh." It is not, therefore, misdirected.

The third averment of the return is somewhat similar to the second. It is in substance, that by none of the Acts of Assembly mentioned, is the corporation known by the name and style of The Mayor, Aldermen, and Citizens of Pittsburgh, authorized to subscribe for stock of the said railroad company, or to issue bonds therefor, or to make provision for the payment of the principal and interest thereof. It is not denied, that such authority was conferred upon the City of Pittsburgh, nor indeed could it be, for it is in direct terms by the Act of February 7th 1853. What is this, then, but an evasive averment? In construing the statute, we are to give effect to the legislative intention, and in speaking of the corporation, it is generally denominated the City of Pittsburgh. This is its common name in the numerous statutes which have been passed conferring upon it privileges, and it has never before been doubted what the legislature intended. Thus, among many instances, when, after the great fire, a state appropriation was made for the relief of the sufferers, it was made only for the sufferers by the fire in the City of Pittsburgh, and was directed to be paid to the Mayor and Select and Common Councils of the said city. Who questioned, then, that this was a benefit conferred upon the Mayor, Aldermen, and Citizens of Pittsburgh? We should justly be regarded as trifling with statutory enactments, were we to hold that the Act of 1853 did not confer upon the municipal corporation the power to subscribe for stock, to issue bonds, and to make provision for the payment of the principal and interest thereof.

Next it is pleaded, that the Select and Common Councils of which the defendants are members, are by law deliberative and legislative bodies only, possessed of an entire discretion in the exercise of all the power committed to their hands, subject to no control whatever beyond their own sense and convictions of duty, so long as they are acting within the legitimate sphere of the

[Com'th *ex rel.* Hamilton *v.* Select and Common Councils of Pittsburgh.]

powers conferred upon them. This is at most a denial of the legal duty, which the writ charges to be resting upon them, coupled with a negation of the right of this court to control their discretion. It may be admitted, that if respondents have an option to do one thing or another, courts will not award a *mandamus* to compel one thing to be done. They cannot be compelled to exercise their discretion in a particular way. Yet, even a judicial officer, as has often been decided, may be commanded to proceed to judgment—an arbitrator to make an award—though what the judgment or award shall be, the court will not direct: *Tapping* 109. But this is not a case in which the defendants have any discretion. This averment in their return mistakes their legal duty. It is not an obligation to consider, to use a discretion, but it is an obligation to act. The 6th section of the Act of February 7th 1853, gave them power to make provision for the payment of the principal and interest by the assessment and collection of such tax as may be necessary for that purpose. As they are public officers, and as the relator is interested in their thus making provision, the possession of the power brings with it the duty to exercise it. Their discretion is taken away. This has already been shown by our remarks upon one of the objections taken to the form of the writ, and the authorities need not again be cited.

Next, the return avers that the Select and Common Councils are not integral parts of the corporation, but only several and co-ordinate branches of the legislature thereof, acting separately and independently of each other; that the concurrence of both bodies is essential to the validity of all legislative acts affecting the corporation; and that the defendants are without power of themselves to assess or impose taxes, or to compel the concurrence of the other branch of said councils in any act. We do not perceive that this is any answer to the mandate of the writ, and no attempt has been made to show us how the fact averred is material. The defendants are all the members of both branches, and if each discharges his duty, there can be no want of concurrence of councils.

The 6th averment of the return, after reciting the Act of 1853, and the ordinance authorizing the subscription, and after admitting that the subscription was made as averred in the writ, and that bonds were given to the company for the amount, proceeds to charge that the Act of Assembly provided that the bonds should be transferable in such manner as should be directed by the city, and that they might be received by the company in such manner as might be agreed upon between the parties. The defendants then aver, that no money was borrowed to pay for the stock, but that the bonds were made payable, and actually delivered to the

company itself, and that no direction was given by the corporation as to the manner in which the bonds should be transferable. How does all this negative the liability of the defendants to make provision for the payment of the interest? Conceding the facts alleged, as the demurrer does, it is only by drawing an erroneous inference of law from those facts, that they become of any importance. We have already shown, that giving the bonds to the company in payment, was a mode of borrowing authorized by the act. But the payment to the company by the bonds was expressly authorized. It would be most illiberal construction, even if it were not so, to hold that the power to assess a tax was conferred only in case the money should be borrowed from third persons and paid to the company.

The other assertion of fact, that the city did not direct how the bonds should be transferred, if it means anything, is a blow at the title of the relator; but it is not denied, in any part of the return, that they were made payable to bearer, and therefore that they passed by delivery, or that they were thus made by the agents of the city. This obviously amounts in effect, though not in words, to a direction of the mode in which they should be transferred. When, therefore, it is averred, that there was no direction, it can only be intended that there was none by express ordinance. The averment is therefore wholly immaterial. It would be allowing a gross fraud, if, after the city has executed its bonds, affixed to them its corporate seal, made them payable to bearer, and sent them out to find purchasers, it might be permitted to say, to one who has advanced his money on the faith of them, that it had not directed how they should be transferred.

The next allegations of the return are, that the city ordinance, which directed the subscription, provided that the directors of the company should agree with the city in writing to pay the current interest accruing on the bonds; that the subscription should not be made until subscriptions to the amount of $350,000 had been first obtained from other responsible sources, other than contractors; that the money realized from the sale of the bonds should be expended in the construction of the road nearest Pittsburgh; that no bonds should be issued or signed by the mayor until the survey and location of the road should be first made and agreed upon by the board of directors; and also, that the councils should appoint three of their number as a committee, under whose control the bonds should be sold, of all which the relator and other holders of the bonds had legal notice, as the defendants believe. The return then proceeds to aver that these conditions were not complied with, and that the company has not paid the current interest, but that it is insolvent.

If the facts thus pleaded can avail the defendants at all, it must be because they show that the city is not liable upon the

[Com'th *ex rel.* Hamilton *v.* Select and Common Councils of Pittsburgh.]

bonds. If, therefore, these facts be all admitted, and yet the liability of the city to pay the debt exist, they constitute no sufficient answer to the writ. Now, it is to be observed, that, by the provisions of the ordinance itself, the mayor was designated as the agent of the corporation to make the subscription, to execute and issue the bonds, and to enter into the agreement with the company that it should pay the current interest. He was the agent of the city alone. True, he was required not to subscribe, or sign bonds, or issue them, until certain preliminary things, intended for the benefit of the city, had first been done; but, from the nature of his agency, he was to determine whether they had been done. When, therefore, the bonds were issued and came into the hands of a purchaser, he had a right to presume that everything preliminary to their lawful issue had been done; for if it had not, the obligors were in fault. The bonds themselves, though referring to the ordinance, gave the purchaser no notice of any default in the city's agent. The return charges, indeed, that the relator and other bondholders had notice of the ordinance and its requirements, but it does not aver that they had any notice of the alleged facts that those requirements, which were prerequisites to the issue and sale of the bonds, had not been complied with. Those facts are entirely outside of the ordinance itself. Still more, the bonds were created for the purpose of sale. They were intended as a means of raising money for the construction of the railroad. It was with this design that the municipal subscription, payable in bonds, was authorized by the legislature. If it had been required that the company should retain the bonds, they would have been useless in the prosecution of their work, and the purpose of the subscription would have been defeated. It was so understood by the city, for the ordinance speaks of their sale, and requires that the moneys realized from the sale should be expended in the construction of the part of the road nearest Pittsburgh. Accordingly, they were issued in the best form for sale and easy transfer; they were made payable to bearer, and consequently passed by delivery. Again, the ordinance directed that the bonds should be issued bearing interest, payable half-yearly; in other words, that by them, the city should assume the obligation to pay not only the principal but the interest, and so the bonds were in fact put upon the market.

Now, under these circumstances, it can with no reason be contended, that the purchaser of the bonds stands in no better situation than the Chartiers Valley Railroad Company, which received them in payment of the subscription. We have not, it is true, decided that such securities are negotiable in the sense in which bills of exchange and promissory notes are held to be, and, in this particular, we have not gone so far as the tribunals of our sister

states, and of England, have gone. We carefully avoided so deciding in the case of The Commonwealth *v.* The Commissioners of Allegheny County, and thus left open a door through which that county might, if she would, secure all the equities which she has. But it has been ruled in this state, that the legal title to a bond of a corporation, payable to bearer, passes by delivery, and that the holder may sue in his own name: Carr *v.* Le Fevre, 3 *Casey* 413. In other words, the obligor is regarded as having bound himself directly to the holder. In the ordinary case of an assignment of a bond, the assignee doubtless takes the security, subject to a right in the obligor to defalcate against the assignor, or show want of consideration or non-existence of the debt. We speak now of assignments which pass the legal title. But, as was said by GIBSON, J., in Davis *v.* Barr, 9 *S. & R.* 141, "With any agreement between the original parties, inconsistent with the purport or legal effect of the instrument, the assignee has nothing to do. * * * The assignee is not bound to call upon the obligor for information about matters, the existence of which he has no reason to suspect; the necessity of inquiry being limited, as I have said, to want of consideration and set-off." This statement is not, indeed, precisely accurate. The obligor may set up against an assignee of the obligee, not only set-off and want of consideration, but he may disprove the existence of the debt. Yet he cannot assert a secret equity, or an agreement merely collateral. And even in the case of an ordinary bond, if it be placed in the hands of an obligee, for the purpose of enabling him to raise money upon it, the purchaser is affected by no want of consideration or defence of the obligor against the obligee. Any other rule would be enabling the obligor to perpetrate a fraud, and indeed, to make use of that fraud to his own advantage. It has often been ruled, that if the obligor encourage a transfer of a common bond, he cannot afterwards deny that he owes it, and this, though the transferee hold it only by equitable assignment. The principle of such a ruling applies with double force to bonds made payable to bearer, where the legal title passes by delivery, and which have been issued for the purpose of sale. The purchaser .of such a bond has a right to presume that every prerequisite necessary to give force to the instrument has been complied with, ·especially, when it is a prerequisite only for the benefit of the obligor.

That portion of the averment which alleges that one of the conditions upon which the bonds were directed by the ordinance to be issued was, that the company should agree to pay the current interest, and that they were delivered to the company on that condition, comes far short of a denial that the city is liable to pay interest to a purchaser and holder. The agreement of the company to pay current interest, was to be an agreement with

[Com'th *ex rel.* Hamilton *v.* Select and Common Councils of Pittsburgh.]

the city, not with the bondholder. It was for the benefit of the city exclusively that it was demanded, and it could by no possibility affect the right of the holder of the bond. The bonds, as has been seen, were authorized by the ordinance to bind the city to pay interest, and they were in truth so issued. That it was intended that the holder was to get interest is not denied, but how could he get it except from the city? The agreement of the company was no contract with him, and the transfer of the bond to him could not amount to an assignment of any security for the payment of interest which the obligor held. It would not pass even if it had been an engagement of a third person to the company to pay the interest: Beckley *v.* Eckert, 3 *Barr* 292. Much less when it is a promise to the debtor. In Davis *v.* Barr, it was held, that with an agreement of the original parties to restrain the use of a bond, an assignee of it had nothing to do. It would be extraordinary, if, in a suit upon a bond of a principal and surety, even the latter could set up as a defence, that the principal had agreed to pay the interest, and that therefore he was not liable; but it would be still more extraordinary if the principal debtor could defend himself under such a promise of the surety. Yet, in this case, the company is not so much as a surety, so far as relates to the holders of the bonds. True, when the bonds were passed from the company, a guarantee of the principal and interest was endorsed, but if the bonds do not bind the city to pay interest, there is nothing but the principal upon which the guarantee can operate. Nor could it make any difference if the holder had notice, when he took the security, that the company had agreed to pay the interest, for the bond in words gave him the obligation of the city to pay, and whether it be as primary debtor or surety, it could not affect him. We have, however, said enough upon these averments of the return to show that they are wholly insufficient.

Next comes an allegation, not of any fact, but of a supposed principle of law. It is, that the bonds, being under the seal of the corporation, are open to every legal defence appearing on their face, and subject to every equity to which they were liable in the hands of the original holders; that all purchasers are affected with notice of such defences; and that the corporation, when sued in a court of law, may avail itself of all such defences, whether legal or equitable. This has already been sufficiently considered and shown to be only partially correct in its application to this case, not standing at all in the way of the relator's right, or the city's liability.

The next averment is but a repetition of what was held in Commonwealth *ex rel.* Thomas *v.* The Commissioners, &c., to be wholly insufficient. It is most evasive. Taken as a whole, it is no denial

[Com'th *ex rel.* Hamilton *v.* Select and Common Councils of Pittsburgh.]

of what the writ asserts, that the relator purchased and is possessed of the bonds.

The assertion that as to any of the bonds other than those held by the relator, the defendants are not bound to answer in this suit, can hardly be called an averment of any fact. It seems intended, however, as an objection to a supposed misjoinder of parties, and, as such, rests upon a plain misconception. The defendants are not called upon to answer several parties, but to respond to the Commonwealth for an alleged neglect and refusal to perform official duty. If that duty exist at all, it is to assess and collect taxes to pay the interest upon all the bonds, and that duty is the same whether one or all of the bondholders apply for the writ of *mandamus: Tapping* 325. That obedience to the writ may have the effect of perfecting the rights of many, is no objection to a writ prosecuted by one relator.

The 12th and next averment is double. The defendants deny that the bonds, or any of them, were transferred in accordance with the Acts of Assembly, or any of them. They also aver that they are prohibited from laying on any more tax on the valuation of taxable property than is already assessed and required for the ordinary uses of the city.

· The defendants do not deny that the bonds were transferred, but only that the transfer was in accordance with the Acts of Assembly. It would be absurd to hold that such an averment negatives any material part of the relator's case. If a transfer, according to Acts of Assembly, was necessary, then the return should aver the particular facts which distinguished the transfer from such an one as the statute demands. Such a return as this has been denominated *shuffling*, and held therefore to be utterly insufficient. See case cited in *Tapping* 352, where the return was, that "a rate was not made according to Act of Parliament." A writ of *mandamus* is not to be answered by a frivolous, evasive, or uncertain return; nor can it be answered by any legal inferences of the defendants from facts not stated. This court has a right to know what the facts are, that it may judge whether the legal inferences are well drawn.

The other averment may be considered in connection with the 16th substantive allegation of the return, which is more definite and certain. It is declared, that the act incorporating the town of Pittsburgh into a borough, prohibited the levy of any tax in any one year exceeding half a cent on a dollar on the valuation of taxable property, unless some object of general utility should be thought necessary, in which case a majority of the taxable inhabitants should approve and certify the same in writing; that this act is recognised and adopted in the act defining the powers of the councils of the city; that the tax, now and for a long time past, required and assessed for the ordinary uses of the city, is at

the rate of half a cent on the dollar annually of the valuation; and that a majority of taxables have never, in writing, approved of the subscription, or of the levy of any additional tax therefor.

The facts pleaded in these averments, so far as they are facts and not legal conclusions, are admitted by the demurrer, but it is still an open question whether the law does impose upon the councils such a restriction as to render the performance of the act, enjoined by the writ, illegal, and therefore impossible. Now, without inquiring how far the powers of the councils were limited by the Act of Assembly incorporating the city of Pittsburgh, it need only be noticed that the very act which authorized the subscription, also empowered, and, as we have seen, made it the duty of the city (acting, of course, through its councils) to provide for the payment of the principal and interest of the debt incurred by the subscription, by the assessment and collection of such tax as may be necessary for that purpose. If there was any restriction upon the rate of taxation before, which we do not say, it was certainly removed by the Act of February 7th 1853, so far as relates to the levy of a tax for the payment of the principal and interest of the debt incurred by the subscription. When the legislature gave the power, it gave with it everything which was necessary for its exercise, and repealed every statutory prohibition of its enjoyment.

The remaining averments of the return may be disposed of in a few words. That the liability of the city upon its bonds is disputed, and that no judgment has been recovered to warrant a *mandamus* execution, are wholly insufficient allegations. The defendants must obey the writ, or show facts from which this court may determine that the debt is not due by the city, or at least that it is doubtful whether it be due. And this writ is not to be confounded with a *mandamus* execution. Nor is the pendency of a suit, upon other bonds than those of the relator, at all material, in the absence of any averment of facts which, if true, would amount to a defence. The same matter is not in controversy in that suit which is contested here.

The 17th averment of the return, in which the defendants allege that they cannot conscientiously consent to levy a tax, because they do not believe that the relator and other holders of the bonds have any legal claim against the city, certainly has the merit of novelty as a defence. It will hardly be expected that we should spend time upon that.

The denial of a demand for the interest has already been sufficiently discussed in our notice of the objections taken to the writ. It is not denied, that the defendants have refused and still refuse to make provision for the payment of the interest. That the company paid until its insolvency, cannot relieve them from

[Com'th *ex rel.* Hamilton *v.* Select and Common Councils of Pittsburgh.]

liability to provide for the payment of what is in arrears, if the city be liable to pay.

The only other allegations of the return are general averments —that the city is a municipal corporation; that the citizens and property-holders never conferred upon the mayor or councils the power to subscribe for stock in a railroad company; that the bonds were issued under the authority of the legislature, without the authority of the inhabitants of the city; and that, therefore, the bonds are not in the nature of a contract. These averments seem intended to negative the policy and constitutionality of the Act of Assembly authorizing the subscription. We shall not discuss them. The impolicy of municipal subscriptions to stock in railroad companies must be admitted, but the constitutionality of laws authorizing them has been sustained not only in this state, but in our sister states, by a weight and uniformity of judicial decisions, such as very few other constitutional views have been able to bring to their support.

Upon a review of the whole case, therefore, we find ourselves constrained to adjudge the return to the alternative *mandamus* insufficient. We might have shown that many of its allegations are uncertain, argumentative, or evasive, but even if the facts alleged be treated as well as pleaded, they amount to no justification for a neglect or refusal to make full and ample provision for the payment of the interest upon the bonds (amounting to $150,000), by the assessment and collection of such taxes as may be necessary for the purpose.

Judgment must, therefore, be entered upon the demurrer against the defendants, and a peremptory writ awarded.

> And now, to wit, February 13th 1860, this cause having come on for hearing, at the last term of the court at Pittsburgh, was fully argued by counsel, whereupon the court, after due and mature consideration thereon had (for that it appears that the said return by the said defendants, made to the alternative writ, is altogether insufficient), do order and adjudge that judgment be entered upon the demurrer for the Commonwealth; and that the defendants and their successors in office be, and they are hereby commanded forthwith to make full and ample provision for the payment of all the interest now due upon the bonds issued by the Mayor, Aldermen, and Citizens of Pittsburgh, in payment of their subscription of $150,000 to the capital stock of the Chartiers Valley Railroad Company, according to the tenor of said bonds, by the assessment and collection of such taxes as may be necessary for the purpose. And it is further ordered that the defendants pay the costs of this suit.